# IN THE COURT OF APPEALS OF IOWA

––––––––––––––––––

No. 25-0461
Filed July 22, 2026

––––––––––––––––––

**Brianne Garrett, as Executor of the Estate of Betty Peer,**
Plaintiff–Appellant,

v.

**IRC II, Inc. d/b/a The Shores, The Shores at Pleasant Hill, Pleasant Hill the Shores an Immanuel Community (and related fictitious names); Immanuel; Myra Waltersdorf; and unknown/unnamed staff personal,**
Defendants–Appellees.

––––––––––––––––––

Appeal from the Iowa District Court for Polk County,
The Honorable Heather Lauber, Judge.

––––––––––––––––––

**REVERSED AND REMANDED**

––––––––––––––––––

Alexander E. Wonio of Lederer Weston Craig PLC, West Des Moines,
attorney for appellant.

Tricia Hoffman-Simanek, Ross T. Andrews, and Graham R. Carl
of Shuttleworth & Ingersoll, P.L.C., Cedar Rapids, attorneys for appellees.

––––––––––––––––––

Considered without oral argument
by Tabor, C.J., Sandy, J., and Mullins, S.J.
Opinion by Tabor, C.J. Dissent by Mullins, J.

**TABOR, Chief Judge.**

After doctors amputated her big toe, Betty Peer[1] sued the assisted-living facility where she resided and a registered nurse employed there, alleging they were negligent in not following her care plan. Most critically, she alleged that the health care providers waited twelve days before filling a prescription for compression socks to address Peer's lower leg issues.

Peer served the defendants with certificates of merit sworn by Dr. Nathaniel Meyer, who was board certified in hospice and palliative medicine and served as a nursing home director. Yet the district court found he was unqualified to give an opinion on the standard of care for the nurse or the facility under Iowa Code sections 147.139 and 147.140 (2021). On appeal, Peer contends her claims did not require an expert. But, if they did, Dr. Meyer was "licensed to practice in the same or a substantially similar field as the defendant[s]." We agree with Peer and reverse the grant of summary judgment for the defendants.

## I.     Facts and Prior Proceedings

Following her discharge from the hospital on July 9, 2021, ninety-two-year-old Peer moved into The Shores, an assisted-living facility in Pleasant Hill.[2] Her discharge orders, as characterized by Dr. Meyer, mandated that

---

[1] Peer died during the district court proceedings, and we granted a motion to substitute Brianne Garrett—the executor of Peer's estate—as the appellant. But for ease of reference, and in line with the parties' briefs, we will continue to refer to Peer as the plaintiff-appellant.

[2] This information is taken from Dr. Meyer's written report, quoted in Peer's preliminary expert witness certification and disclosure. We may look to facts outside the pleadings when considering a summary judgment ruling under Iowa Code section 147.140. *See Butler v. Iyer*, No. 21-0796, 2022 WL 1100275, at *8 (Iowa Ct. App. Apr. 13, 2022).

The Shores treat Peer's lower leg issues. But in the doctor's opinion, "even the basic mandated orders were not followed." He opined that "Peer never received a complete, formal, or appropriate evaluation for a care plan." Describing what he believed to be a specific violation of the standard of care, Dr. Meyer stated:

> For example, Ms. Peer was prescribed compression stockings. Apparently, due to the fact they did not have a tape measure (an unacceptable excuse), these stockings were not ordered for many days—and thus were not worn. Later, the Defendants became aware of Ms. Peer not wearing the prescribed compression stockings, but failed to communicate this fact to any of the care providers.

According to Peer's petition, it took twelve days for The Shores to obtain the prescribed compression socks and staff then "did not assist [her] in applying . . . and removing them." By July 28, a wound developed on the bottom of Peer's left foot. Peer alleged that staff "failed to respond to [her] cries for assistance." The next day, she was admitted to a hospital, where she underwent emergency surgery. Surgeons were required to amputate her left big toe.

Peer sued The Shores and Myra Waltersdorf—a registered nurse employed there—alleging these defendants were directly or vicariously liable for the negligent conduct that caused her injuries. Specifically, Peer alleged that the defendants breached a duty of care by:

1. failing "to properly prepare Plaintiff's care plan,"

2. failing "to follow the specifics of Plaintiff's care plan,"

3. failing "to apply Plaintiff's prescriptions,"

4. failing "to properly communicate their failures to Plaintiff,"

5. failing "to properly and accurately communicate Plaintiff's circumstances to other care providers,"

3

6. failing "to provide adequate and proper staff," and

7. failing "to provide adequate and appropriate care, treatment, and services."[3]

As required by Iowa Code section 147.140, Peer served the defendants with certificates of merit, signed by Dr. Meyer. His curriculum vitae showed that he was board certified in family practice, as well as hospice and palliative medicine. He also taught geriatrics in his family practice courses to second-, third-, and fourth-year residents at the University of Iowa College of Medicine. And he had been the director of the Laurens Nursing Home since 2005.

The defendants moved to dismiss and for summary judgment, arguing Dr. Meyer was unqualified to offer an opinion on the standard of care for the nurse or the assisted-living facility. Contending Peer did not satisfy the expert witness standards in Iowa Code sections 147.139 and 147.140, they urged the district court to dismiss with prejudice. The district court did so.

Peer now appeals, challenging the district court's application of the certificate-of-merit statute.

## II.    Analysis

Peer advances two claims of error. First, she asserts that the district court erred in concluding the certificate-of-merit requirement applies. In her view, this case does not involve "a cause of action for which expert testimony

---

[3] The district court record contains some discussion of "contractual" and "regulatory" claims. For example, the petition asserts that an investigation by the Iowa Department of Inspections and Appeals determined that the defendants failed to "meet applicable law" resulting in sanctions and fines. But on appeal, Peer only asks us to reverse the grant of summary judgment on her negligence claims. Thus, we limit our analysis to those issues.

is necessary to establish a prima facie case." Iowa Code § 147.140. Second, Peer contends the court was wrong to find that Dr. Meyer lacked the qualifications necessary to offer an opinion on the applicable standard of care. We address these issues in turn, reviewing for correction of legal error. *Jones v. Lindell*, 32 N.W.3d 445, 450 (Iowa 2026).

### A. Is a Certificate of Merit Required for Peer's Claims?

Section 147.140 applies:

> when a plaintiff pleads (1) an action for personal injury or wrongful death, (2) against a health care provider, (3) which is based upon the alleged negligence in the practice of that profession or occupation or in patient care, and (4) includes a cause of action for which expert testimony is necessary to establish a prima facie case.

*Struck v. Mercy Health Servs.-Iowa Corp.*, 973 N.W.2d 533, 540 (Iowa 2022) (cleaned up). The first three elements are satisfied: Peer brings an action for personal injury based on the professional negligence of nurse Waltersdorf and The Shores.[4] *See* Iowa Code § 147.140(7) (incorporating Iowa Code section 147.136A, which defines "health care provider" to include "a registered nurse" and "a health facility"). Thus, the fighting issue is whether Peer needed expert testimony to establish her prima facie case of negligence.

As a rule, a plaintiff must furnish expert testimony to establish the applicable standard of care for a claim of professional negligence against a

---

[4] It appears from her petition that Peer intended to raise primarily claims of vicarious liability against The Shores as the employer of the alleged tortfeasor. The possible exception is Peer's claim that the defendants "failed to provide adequate and proper staff," which might be construed as a direct-negligence claim against The Shores. But the district court found that "Dr. Meyer is not qualified to opine on the standard of care applicable to The Shores." So we will review that finding, as well as the conclusions involving nurse Waltersdorf.

healthcare provider. *Est. of Butterfield v. Chautauqua Guest Home, Inc.*, 987 N.W.2d 834, 841 (Iowa 2023); *Struck*, 973 N.W.2d at 539. But our supreme court has recognized two exceptions. One is for cases in which the provider's "lack of care is so obvious as to be within the comprehension of a layperson," such as where a surgical instrument is left in the body or where a physician operates on the wrong limb. *Butterfield*, 987 N.W.2d at 841 (cleaned up). Another exception is for claims involving "nonmedical, administrative, ministerial, or routine care." *Id.* (quoting *Kastler v. Iowa Methodist Hosp.*, 193 N.W.2d 98, 101 (Iowa 1971)). Peer asserts that her claims fall within this second category.

The supreme court has not formulated a precise definition for "routine" care. *Kastler*, 193 N.W.2d at 102. Instead, it has focused on the nature of the activity. *Id.* For example, assisting patients with showers is a routine activity for which lay knowledge is sufficient to assess reasonable care; so expert testimony was not required when an epileptic patient suffered a seizure while unattended in the shower. *Id.* Our court reached the same conclusion on claims brought by post-operative patients who fell while unattended in the bathroom, *Landes v. Women's Christian Ass'n*, 504 N.W.2d 139, 141 (Iowa Ct. App. 1993), and while unrestrained in an x-ray chair, *Cockerton v. Mercy Hosp. Med. Ctr.*, 490 N.W.2d 856, 859 (Iowa Ct. App. 1992). In these cases, the jury could rely on its common understanding to determine the reasonable care that the plaintiff's "known mental and physical condition required." *Kastler*, 193 N.W.2d at 102.

By contrast, the act of repositioning a bedridden patient to avoid pressure sores was not routine or ministerial when the patient objected to being moved. *Thompson v. Embassy Rehab. & Care Ctr.*, 604 N.W.2d 643, 646 (Iowa 2000). Deciding whether it was negligent for the nursing staff not to

perform periodic "forced repositioning" required expert testimony. *Id.* But *Thompson* did not represent an "analytical shift" away from *Kastler*. *Davis v. Montgomery Cnty. Mem'l Hosp.*, No. 05-0865, 2006 WL 1896217, at *4 (Iowa Ct. App. July 12, 2006). Rather, *Thompson* presented "special circumstances" outside the understanding of a lay jury. *Id.*

Distilled down, "the necessity of expert testimony depends on whether 'the proper course of action' is 'within the common understanding of the jury.'" *Jorgensen v. Smith*, 2 N.W.3d 868, 880 (Iowa 2024) (quoting *Thompson*, 604 N.W.2d at 646). "Put another way, it depends on whether all the primary facts can be accurately and intelligibly described to the jury, and whether they, as persons of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are expert witnesses." *Id.* (cleaned up).

The particulars of negligence alleged in Peer's petition do not require expert testimony to determine the standard of care. The focus of those allegations is the defendants' twelve-day delay in filling Peer's prescription for compression socks, along with the related failure to assist Peer in putting on and taking off the compression socks as indicated in her care plan. The petition also alleged that the defendants "did not communicate [Peer's] lack of use of compression socks" to Peer's family or other medical care providers.

In her petition, Peer did not limit her claims to "professional negligence." *Contra Struck*, 973 N.W.2d at 543. And unlike *Struck*, the question is not whether Peer "was improperly medicated and supervised in light of her condition" which would be "beyond the understanding of ordinary jurors." *Id.* Rather, the question is whether a lay juror could understand the proper action for a nurse employed by an assisted-living

7

facility when an elderly woman arrives with a prescription for compression socks to treat an existing foot wound.

No professional judgment was required to comply with the doctor-ordered prescription. The petition alleges that the delay related to the lack of a tape measure. This allegation invokes ordinary care not requiring expert testimony. Negligence in filling, or not filling, this prescription is within the common understanding of lay jurors. *See Bonney v. United States*, No. 4:13-cv-00415, 2015 WL 11117318, at *7 (S.D. Iowa Mar. 25, 2015); *see also Bazel v. Mabee*, 576 N.W.2d 385, 387 (Iowa Ct. App. 1998) (reversing summary judgment ruling in favor of defendants where evidence that antiseptic was used despite patient's reporting an allergy showed lack of care sufficient to generate jury question on negligence without expert testimony).

Likewise, expert testimony was not required for the related claim of failure to communicate the delay in filling the compression sock prescription. *See Campbell v. Delbridge*, 670 N.W.2d 108, 113 (Iowa 2003) (deciding factfinder could resolve issues concerning lack of communication between doctor and nurses and possible mix-up in patient charts without expert opinion). This case differs from *Zaw v. Birusingh*, where we found that expert testimony was required to establish a claim of "negligent communication" for not obtaining information from outside care providers before performing a vasectomy. 974 N.W.2d 140, 161–62 (Iowa Ct. App. 2021). Peer is not alleging nurse Waltersdorf was negligent for acting without a thorough investigation. The claim is that she did not communicate her failure to act to other health care providers or Peer's family.

Because the proper course of action in following Peer's care plan was within the understanding of a lay juror, we find that the district court wrongly

applied section 147.140 to conclude that defendants were entitled to dismissal of Peer's claims.[5]

## B. Did Dr. Meyer Qualify as an Expert Witness?

But even if the certificate-of-merit statute applies, Peer fulfilled its requirements. That statute provides that a plaintiff's certifying expert "must meet the qualifying standards of section 147.139." Iowa Code § 147.140(1)(a).

As relevant here, those standards require:

> 1. The [expert] is licensed to practice in the same or a substantially similar field as the defendant, is in good standing in each state of licensure, and in the five years preceding the act or omission alleged to be negligent, has not had a license in any state revoked or suspended.

> 2. In the five years preceding the act or omission alleged to be negligent, the [expert] actively practiced in the same or a substantially similar field as the defendant or was a qualified instructor at an accredited university in the same field as the defendant.

*Id.* § 147.139(1)–(2). Peer bears the burden to show the expert satisfies these conditions. *See Jones*, 32 N.W.3d at 453.

The district court found Peer did not satisfy that burden because Dr. Meyer was unqualified to testify about the appropriate standard of care for a nurse or assisted-living facility. On appeal, Peer challenges that

---

[5] The district court "agree[d] that expert testimony may not be necessary for a jury to understand that a nurse should ensure that a patient timely and appropriately receives the items prescribed to that patient." Then the court shifted focus and decided, "a lay person would not be able to determine causation without such expert testimony." But "Iowa Code section 147.140(1)(a) does not require plaintiffs to submit certificates of merit attesting to causation even though expert testimony about causation is necessary for the plaintiff to state a prima facie case." *Butterfield*, 987 N.W.2d at 840. So the district court's concern about causation was misplaced.

conclusion, arguing Dr. Meyer is licensed and experienced "in the same or a substantially similar field" as the defendants.

According to his expert disclosures, Dr. Meyer is a board-certified family-practice and hospice physician practicing under an active Iowa medical license. During the five years preceding Peer's injury, he held positions as a physician, hospice director, and nursing home director in several northwest Iowa communities. He is also an adjunct professor in the University of Iowa College of Medicine's family medicine department, teaching geriatrics. Peer contends that these qualifications "plainly satisf[y]" section 147.139's requirements. The defendants disagree, emphasizing that Dr. Meyer and nurse Waltersdorf hold different professional licenses regulated by separate statutory schemes. *See generally* Iowa Code c. 148 (medicine); *id.* c. 152 (nursing).

After the parties filed their appellate briefs in this case, our supreme court decided *Jones*.[6] There, Jones sued a gynecologist but designated a urologist as an expert witness. 32 N.W.3d at 448–49. The defendants argued that the term "field" in section 147.139(1) and (2) referred to a subset of practice within the same licensed medical profession. *Id.* at 451. The supreme court rejected that argument as inconsistent with the statute. *Id.* at 451–52. Quoting the dictionary, the court defined "field" as a "category, or division wherein a particular activity or pursuit is carried out." *Id.* at 451 (quoting *Field*, *Webster's Third New Int'l Dictionary* 845 (unabr. ed. 2002)). The court reasoned that "[b]ecause the statute applies to different categories of health

---

[6] Counsel for The Shores provided a notice of additional authority and described *Jones* as holding that the term "field" in Iowa Code section 147.139(1)–(2) "categorically distinguishes one type of health care provider 'licensed, certified, or otherwise authorized' to administer health care in this state from another."

care providers, the most logical interpretation of the qualification provision in section 147.139 is that the term 'field' categorically distinguishes one type of health care provider . . . from another." *Id*. Because both the gynecologist and the urologist were licensed physicians, the court held that they practiced in the same field, as that term was used in section 147.139. *Id*. at 452. The court did "not consider the issue of what constitutes a substantially similar field within the meaning of the statue." *Id*.

That is our quandary today. Was Dr. Meyer qualified as a licensed practitioner in "a substantially similar field" as the defendants? Iowa Code § 147.139(1)–(2). To decipher what the legislature meant by "substantially similar" we look again to *Jones*. The court considered the scope of the words "substantially similar specialty" in subsection (3) for purposes of the related standard for experts who testify against board-certified providers:

> Generally speaking, "substantially similar" means that one thing has a high degree of likeness to another but may be less than identical. A specialty is "something in which one specializes or of which one has special knowledge." As used here, then, substantially similar board-certified medical specialties are those specialties that have a high degree of likeness but are not identical.

> We conclude that two board-certified medical specialties are substantially similar when they share a high degree of likeness in their core characteristics such that a practitioner certified in one specialty would, by virtue of that certification alone, possess the foundational knowledge and competence to evaluate and opine on the standard of care applicable to the other specialty. The inquiry is categorical, not case specific. Courts must assess whether the specialties themselves are substantially similar without regard to whether the particular expert has individual training or experience relevant to the specific medical problems or treatments at issue in the case.

*Id*. at 452–53 (internal citations omitted); *see also id*. at 453–54 (finding Jones failed to show urology was substantially similar specialty as gynecology).

When the legislature repeats terms in the same statute, we assume their meaning does not vary. *See State v. Richardson*, 890 N.W.2d 609, 619 (Iowa 2017). Thus, it is logical to conclude the legislature intended "substantially similar" to carry the same meaning when used in consecutive paragraphs of section 147.139. *See id.* So assuming the supreme court's interpretation of "substantially similar" applies with equal force throughout section 147.139, Peer must show that Dr. Meyer and the defendants—while not licensed in identical fields—practice in fields with "a high degree of likeness." *Cf. Jones*, 32 N.W.3d at 452. In other words, their fields share "common core characteristics or are largely alike in substance or essentials." *Id.* (quoting *Johnson v. Commonwealth*, 674 S.E.2d 541, 543 (Va. Ct. App. 2009)).

Where this case diverges from *Jones* is the statutory term that the phrase "substantially similar" modifies. *Jones* examined whether physicians in two board-certified *specialties* (gynecology and urology) possessed "the foundational knowledge and competence to evaluate and opine on the standard of care applicable to the other specialty." *Id.* at 452–53 (interpreting section 147.139(3)). In contrast, we must decide whether Dr. Meyer was "licensed to practice" and "actively practiced" in "a substantially similar *field*" as the defendants. Iowa Code § 147.139(1)–(2) (emphasis added).

The legislature understood that a "field" and a "specialty" are distinct divisions of professional practice. A board-certified specialty represents a narrow swath of medical, osteopathic, or podiatric expertise. *See* Iowa Code § 147.139(3). Meanwhile, a field denotes a broader "category, or division wherein a particular activity or pursuit is carried out." *See Jones*, 32 N.W.3d at 451 (relying on dictionary definition). Given those distinctions, the question of "foundational knowledge and competence" for health care

12

providers in different fields requires an analysis not conducted in *Jones*. *Id.* at 452–53.

Indeed, Iowa's appellate courts have not yet decided whether a licensed physician could be qualified under section 147.139 to offer an opinion on the standard of care for registered nurses or assisted-living facilities. True, in a case predating the certificate-of-merit statute, our court found no abuse of discretion under Iowa Rule of Evidence 5.702 when a district court concluded that a cardiologist "was not qualified to render an opinion as to the standard of professional nursing care applicable to reporting changes in a patient's condition to the patient's doctor." *Est. of Llewellyn ex rel. Johnson v. Genesis Med. Ctr.*, No. 03-1506, 2004 WL 2579741, at *3 (Iowa Ct. App. Nov. 15, 2004). Our court said:

> While we may not have reached the same conclusion as the district court, given [the cardiologist]'s equivocal statements about his personal expectations as opposed to knowledge of general standards, and his indirect role in setting relevant nursing standards at his own hospitals, we cannot conclude the district court clearly abused its discretion in concluding [the cardiologist] was not qualified to render the requested opinion.

*Id.* Because of the deferential standard of review and the fact-specific analysis, we take little guidance from *Llewellyn*.

Likewise, decisions from other jurisdictions assessing the qualifications of doctors to testify against nurses often depend on the factual allegations and not the providers' titles.[7] *See, e.g.*, *Liebsack v. United States*,

---

[7] Illinois appears to categorically prohibit physicians from testifying about the nursing standard of care. *Sullivan v. Edward Hosp.*, 806 N.E.2d 645, 658 (Ill. 2004) (rejecting proposition that "[t]here is nothing which a nurse can do which a doctor cannot do").

731 F.3d 850, 858 (9th Cir. 2013) (concluding under Alaska law that a board-certified family practice physician was not qualified to testify to the standard of care for a psychiatric nurse given the "matter at issue"); *Belfance v. Barry*, No. 5:18CV1739, 2019 WL 997103, at \*4 (N.D. Ohio Mar. 1, 2019) (finding psychiatrist familiar with standards of care for psychiatric evaluation and treatment was qualified to opine regarding standard of care for nurse); *Husby v. S. Ala. Nursing Home, Inc.*, 712 So. 2d 750, 753 (Ala. 1998) (affirming disqualification of anesthesiologist because applicable standard of care involved "'hands on' nursing care," not use of anesthetics); *Beilenson v. Jefferson Par. Hosp. Serv. Dist. No. 2*, 891 So. 2d 74, 82 (La. Ct. App. 2004) (allowing physician testimony to establish nursing standard of care); *Staccato v. Valley Hosp.*, 170 P.3d 503, 507 (Nev. 2007) ("[T]he acceptable standard of care is governed by the procedure or treatment at issue, not the defendant's practice area or specific license."); *Tenet Hosps. Ltd. v. De La Rosa*, 496 S.W.3d 165, 171 (Tex. Ct. App. 2016) (finding physician qualified to opine on nursing standard of care because he regularly cared for hospitalized patients).

Returning to *Jones*, we recognize that the supreme court said the inquiry for determining whether physicians' specialties were "substantially similar" was "categorical, not case specific." 32 N.W.3d at 453 ("Courts must assess whether the specialties themselves are substantially similar without regard to whether the particular expert has individual training or experience relevant to the specific medical problems or treatments at issue in the case."). But does that same categorical inquiry govern whether health care providers are licensed to and actively practice in a "substantially similar" field? Is it an all-or-nothing proposition whether any doctor is qualified to present an expert opinion on the standard of care for any registered nurse or health facility? Or do we examine the particular training and experience of the doctor designated as an expert as relevant to the

14

specific medical problems and treatments at issue in the case? *See Ward v. Unity Healthcare*, No. 20-1516, 2021 WL 5918408, at *5–6 (Iowa Ct. App. Dec. 15, 2021) (upholding district court's finding that emergency room physician was not qualified to testify against hospital administrators, nursing staff, or radiologists under section 147.139 because he did not "mention[] any training or certification in hospital administration, nursing, or radiology").

Also, because the statute only discusses specialties in the context of board certification, should the term "field" be interpreted to encompass some measure of the kind of health care being provided and to what population? To that end, would a pediatric nurse be qualified to give a standard-of-care opinion for a nurse tending to geriatric patients but a doctor who teaches geriatrics to medical students would not be?

As we strive to interpret the standards in sections 147.139(1) and (2), we start with the text. *Hummel v. Smith*, 999 N.W.2d 301, 305 (Iowa 2023). If the language is unambiguous, we accept the plain meaning of the words. *Id.* But if the meaning of the words or their context creates an ambiguity, we consult tools of statutory interpretation. *Id.* at 306 (finding ambiguity in term "licensed to practice" in section 147.139).

The district court determined that section 147.139 was unambiguous. But without the benefit of *Jones*, the district court did not distinguish between "a substantially similar field" and "a substantially similar specialty" as those phrases appear in different subsections of the statute. When we read the statute as a whole, we find that reasonable minds could differ on the meaning of the phrase "substantially similar field" in subsections (1) and (2). For instance, Peer contends that we must examine Dr. Meyer's qualifications to determine whether he practices in a substantially similar field as the defendants. But the defendants would limit the inquiry to comparing the

practice of medicine to the practice of nursing. *Compare* Iowa Code § 148.1(2) (medicine) *with id.* § 152.1(6) (nursing).

As discussed, in construing the phrase "substantially similar" in subsections (1) and (2), we take clues from how *Jones* defined that phrase in section 147.139(3).[8] *See* 32 N.W.3d at 452. Borrowing from *Jones*, we ask whether the two fields "share a high degree of likeness in their core characteristics" such that a practitioner in one field would "possess the foundational knowledge and competence to evaluate and opine on the standard of care applicable to the" other field. *Id.* at 452–53.

In *Jones*, the court decided that the similarity of board-certified specialties must be evaluated "by virtue of that certification alone" and not the "individual training or experience" of the designated expert. *Id.* Factors relevant to that evaluation include "the formal definitions of the specialties, the certifying board structures, similarities in education and training, similarities in the scope of practice, overlap in core and procedural competencies, professional association overlap, and hospital credentialing patterns." *Id.* at 453.

In comparing "fields" of health care providers, we have less defined data points than *Jones* identified for "specialties" of board certification. But

---

[8] One tool of interpretation is to presume that in enacting a statute, the legislature intended "just and reasonable" results. *Hummel*, 999 N.W.2d at 306–07 (noting that when a statute is ambiguous, courts may consider the consequences of a particular construction). The consequences of defendants' construction would be to read the phrase "substantially similar" out of the statute. That reading would not be just or reasonable. The legislature chose to broaden the expert witness standards beyond people licensed to practice in the *same* field as the defendant to people licensed in *substantially similar* fields. So we must decide what "substantially similar" means in this context.

one place to start is the comparison between Iowa Code chapter 148 on medicine with chapter 152 on nursing, as cited by the defendants.

On the doctor side, persons are engaged in the practice of medicine if they "publicly profess to be physicians and surgeons or osteopathic physicians and surgeons" or "prescribe, or prescribe and furnish, medicine for human ailments or treat the same by surgery." Iowa Code § 148.1(2). Drilling down, the administrative rules define "the practice of medicine and surgery" as:

> holding one's self out as being able to diagnose, treat, operate or prescribe for any human disease, pain, injury, deformity or physical or mental condition and who shall either offer or undertake, by any means or methods, to diagnose, treat, operate or prescribe for any human disease, pain, injury, deformity or physical or mental condition.

Iowa Admin. Code r. 481-650.1.

On the nursing side, the "practice of the profession of a registered nurse" includes providing care "which is supportive to or restorative of life and well-being" and "execut[ing] regimen prescribed by a physician, an advanced registered nurse practitioner, or a physician assistant." Iowa Code § 152.1(7). The standards of practice for registered nurses "[r]eceiving a physician's . . . or other health care provider's orders and seeking clarification of orders when needed." Iowa Admin. Code r. 481-620.2(3). They also include:

> Communicating and consulting with other health team members regarding the following: (1) patient concerns and special needs; (2) patient status and progress; (3) patient response or lack of response to interventions; (4) significant changes in patient condition; (5) interventions that are not implemented, based on the registered nurse's professional judgment, and providing: (1) a timely notification to the physician . . . or other health care provider who prescribed the intervention that the order was not executed and reason(s) for not executing the order; (2) documentation in the

17

> medical record that the physician . . . or other health care provider was notified and reason(s) for not implementing the order; and (3) if appropriate, a timely notification to other persons who, based on the patient's circumstances, should be notified of any orders that were not implemented.

Iowa Admin. Code r. 481-620.2(3)(m) (cleaned up). And those nursing standards contemplate "revising plan of care as needed." Iowa Admin. Code. r. 481-620.2(3)(n).

Putting these medicine and nursing standards side by side, the noticeable overlap involves prescriptions. A core characteristic of practicing medicine is prescribing treatment for human ailments. And a core characteristic of being a registered nurse is executing those prescriptions, which is Peer's central negligence allegation. Thus, a categorical inquiry based on state licensing standards shows a substantial similarity between these two fields.

The similarity is even stronger when we factor in Dr. Meyer's training and experience. He is board certified in family practice and hospice and palliative medicine—specialties that focus on aging patients. Peer's counsel asserted at the summary judgment hearing that "geriatrics is a significant portion" of his family practice and teaching. He also has directed hospice programs and nursing homes. His practice is substantially similar to defendant Waltersdorf, a registered nurse at an assisted-living facility.

As for The Shores, it is an assisted-living program, defined as a "health facility" in Iowa Code section 135P.1(3)(e), and which is certified under Iowa Code chapter 231C. "Assisted living" means the "provision of housing with services which may include" health-related and personal care. Iowa Code § 231C.2(2). "Health-related care" includes "services provided by a registered nurse" and "personal care" means assistance with "essential

activities of daily living" which may include dressing and grooming. *Id.* § 231C.2(6), (10). Because Dr. Meyer was qualified to offer an opinion on the standard of care for nurse Waltersdorf, he was likewise qualified to act as an expert witness against the health facility that employed her.

As our bottom line, we find that the district court erred in deciding that Peer needed an expert witness to establish her claims of negligence. But if she did, Dr. Meyer meets the criteria to serve as an expert witness under section 147.139(1) and (2). We reverse the grant of summary judgment and remand for further proceedings.

**REVERSED AND REMANDED.**

Sandy, J., concurs; Mullins, S.J., dissents.

**MULLINS, Senior Judge** (dissenting).

I respectfully dissent from the majority's conclusion that Peer's suit may proceed to trial without the support of a qualified expert. These professional negligence claims require expert testimony, and Peer has failed to show that Dr. Meyer meets the statutory requirements to opine on the applicable standard of care.

\* \* \*

Although this case comes to us on appeal from summary judgment,[9] we know relatively little about Peer's claims. Our factual record consists primarily of Dr. Meyer's curriculum vitae and some administrative records detailing the licensure status of nurse Waltersdorf and The Shores. We have no testimony, affidavits, or medical records to flesh out Peer's allegations. And while she filed a two-page report from Dr. Meyer in conjunction with her expert disclosures, it adds little factual content. Dr. Meyer largely recites Peer's petition in opining that the defendants breached the standard of care.

I mention this to dispel any assumptions about the nature of our review. We have been asked to decide whether expert testimony is required for Peer's claims based almost exclusively on the language of her thirty-six-paragraph petition. In doing so, we must be mindful of Iowa's liberal pleading standard. *See Struck v. Mercy Health Servs.-Iowa Corp.*, 973 N.W.2d 533, 538 (Iowa 2022). But we may not recast Peer's claims in order to spare them

---

[9] The defendants' motion—styled as a "Motion to Dismiss and for Summary Judgment"—primarily argued that Peer's negligence claims could be dismissed for failure to comply with Iowa Code section 147.140 (2021). Alternatively, the defendants argued that summary judgment was proper because Peer could not make out a prima facie case of professional negligence without a qualified expert. The district court addressed both arguments under the summary judgment standard.

20

from the requirements of section 147.140. *Id.* at 540–41 (finding the court of appeals erred in construing a plaintiff's malpractice petition as "broad enough to encompass ordinary negligence claims"). Expert testimony is the rule, not the exception. *Est. of Butterfield v. Chautauqua Guest Home, Inc.*, 987 N.W.2d 834, 841 (Iowa 2023). Looking to "the allegations actually pleaded within the four corners of [Peer's] petition," *Struck*, 973 N.W.2d at 541, I would find expert testimony is needed to establish the applicable standard of care.

Many of Peer's claims expressly challenge nurse Waltersdorf's exercise of professional judgment in administering Peer's care plan and responding to her condition. She alleges nurse Waltersdorf failed to "properly prepare" her care plan, failed to "properly communicate" with Peer and other providers, and failed to "provide adequate and appropriate care" for Peer's wound. These are not breaches "so obvious as to be within the comprehension of a layperson." *Est. of Butterfield*, 987 N.W.2d at 841 (cleaned up). Nor are they matters of "administrative, ministerial, or routine care," like keeping a woozy patient upright. *Cf. Kastler v. Iowa Methodist Hosp.*, 193 N.W.2d 98, 102 (Iowa 1971). Expert testimony is necessary for the jury to know what is "proper," "adequate," and "appropriate" for a registered nurse to do under the circumstances nurse Waltersdorf faced. *See Thompson v. Embassy Rehab. & Care Ctr.*, 604 N.W.2d 643, 646 (Iowa 2000).

To be sure, Peer's other specifications of negligence assert breaches that sound less like matters of judgment and more like failures of protocol. She claims that nurse Waltersdorf "failed to follow the specifics of [her] care plan" and "failed to apply [her] prescriptions." But a plaintiff may not avoid the need for expert testimony simply by characterizing a breach as non-discretionary. *See Jorgensen v. Smith*, 2 N.W.3d 868, 880 (Iowa 2024) (noting

the necessity of expert testimony "should not depend on labels"). The essential question is "whether the proper course of action is within the common understanding of the jury." *Id.* (cleaned up). I would not presume that jurors who lack nursing experience intuitively understand the nuances of interpreting and applying medical orders. *See Kastler*, 193 N.W.2d at 102–03 (explaining a doctor's orders do not necessarily dictate the standard of reasonable care for nursing staff); *Guillory v. Royal, Inc.*, 971 So. 2d 1234, 1237 (La. Ct. App. 2007) (finding expert testimony was required for a claim that a nursing home employee was negligent in failing to follow a doctor's order to supervise the plaintiff while eating). The district court was correct to find section 147.140 applies to Peer's claims.

* * *

Because expert testimony is necessary in this case, Peer was required to obtain certificates of merit from an expert who "meet[s] the qualifying standards of section 147.139." Iowa Code § 147.140(1)(a). Under that section, an expert must be licensed and must have practiced "in the same or a substantially similar field as the defendant" against whom they will testify. *Id.* § 147.139(1)–(2). Nobody suggests that Dr. Meyer—a family physician—practices in the "same . . . field" as nurse Waltersdorf. *See Jones v. Lindell*, 32 N.W.3d 445, 451 (Iowa 2026) ("A designated expert and a health care provider defendant are thus licensed in and practice in the same field if they hold the same license and practice under the same license."). Rather, it was Peer's burden to show that Dr. Meyer is licensed and practices in a "substantially similar field." To this end, Peer offered virtually no support, arguing only that the qualifications set forth in Dr. Meyer's CV "plainly satisf[y]" section 147.139's requirements.

22

Our supreme court recently explained that section 147.139 "requires courts to make a categorical determination" regarding a proposed expert's qualifications without regard to the expert's experience or "the actual problems or treatments at issue." *Id.* at 452. So, the question here is not whether Dr. Meyer's unique credentials equip him to opine on nurse Waltersdorf's particular conduct, but whether the field of medicine is categorically similar to the field of nursing. *See* Iowa Code § 147.139(1)–(2). I do not think the answer is so obvious as to decide without "competent evidence." *Jones*, 32 N.W.3d at 454. After all, our court previously declined to hold a physician was necessarily qualified to opine on the nursing standard of care. *See Est. of Llewellyn ex rel. Johnson v. Genesis Med. Ctr.*, No. 03-1506, 2004 WL 2579741, at *3 (Iowa Ct. App. Nov. 15, 2004) (leaving the doctor's qualifications to the district court's discretion). And at least one jurisdiction applying a similar categorical approach requires a licensed nurse to testify. *See Sullivan v. Edward Hosp.*, 806 N.E.2d 645, 660 (Ill. 2004).

At the bottom of this appeal is a failure of proof. Peer sued a registered nurse, and it was her burden to show that Dr. Meyer is licensed to practice in a substantially similar field. *See* Iowa Code § 147.139 (stating a court may find an expert qualified only if the statutory requirements "are established by the evidence"). She put forward nothing to support such a finding. *See Jones*, 32 N.W.3d at 454–55. While a different record may well have proved that Iowa doctors are categorically qualified to opine on the nursing standard of care, we should not fill the gap in this case with lay assumptions about these professions.

I would affirm.

23